**In the Interest of B.B., Appellee.**

**Appeal of L.S. and B.S., Appellants.**

**In the Interest of M.S., Appellee.**

**Appeal of L.S. and B.S. Appellants.**

Superior Court of Pennsylvania.

Argued Sept. 15, 1999.

Filed Dec. 16, 1999.

Reargument Denied Feb. 22, 2000.

Orris C. Knepp, III, Lewistown, for appellants.

Thomas M. Torquato, Lewistown, for appellees.

Before KELLY, HUDOCK and HESTER, JJ.

HESTER, J.:

¶ 1 This is an appeal by biological parents from an order adjudicating their two children dependent and awarding custody to Mifflin County Children and Youth Services ("CYS"). We affirm.

¶ 2 Appellants, L.S. and B.S., Mother and Father, respectively, are the biological parents of B.B., born June 15, 1992, and M.S., born September 6, 1993. At the time of the November 23, 1998 hearing, the boys were six and five years old. Tes-

timony established that CYS had been involved with Mother and the boys since 1993. N.T., 11/23/98, at 21, 43. Father was unknown to CYS and to the boys, who met Father once in the summer of 1998. *Id.* at 40, 56.

¶ 3 The trial court set forth its factual findings in its Pa.R.A.P. 1925 opinion as follows:

The subject children of these dependency actions are [B.B.], born June 15, 1992, and [M.S.], born September 6, 1993. [L.S.] (mother) of Lewistown, Mifflin County, Pennsylvania, and [B.S.] (father) of Sharon, Mercer County, Pennsylvania, are the natural parents of both children. The children were in mother's custody from birth until being voluntarily placed with CYSS on October 5, 1998. The only contact father had with the children prior to the filing of the dependency actions was a trip with mother and the children to Sea World (Ohio) in August, 1998. (N.T. 38–39). He had never spent time alone with the children where he was responsible for their care nor did he live with mother after their births. (*Ibid.*) As such, father was a voluntarily absent parent since birth, save the trip to Sea World, and his parental rights could have been terminated.[1]

Mother's borderline retardation and alcohol problem are the primary factors in her inability to care for the children on her own. (N.T. 30–32). CYSS recognizes mother will never be able to take care of the children without some type of outside assistance. CYSS filed the dependency petitions due to ongoing concerns with mother's inability to care for the children despite intensive intervention by various social service agencies. (N.T. 25). CYSS first became involved with these cases in November, 1993, yet mother never demonstrated an ability to care for the children without constant supervision. (N.T. 21, 30). In fact, her ability to care for and control the children deteriorated markedly in the months preceding the filing of the dependency petitions. (N.T. 8).

Social workers from the Meadows Psychiatric Center, Sun Home Health and CYSS all testified to the deplorable conditions of mother's trailer observed during regular home visits. The kitchen was filled with a week's worth of dirty dishes and clothes and toys were strewn about the trailer. The yard was full of garbage, some of which was bagged, some of which was not. (N.T. 12). Margaret Horner of CYSS saw a broken window on the porch connected to the trailer and glass scattered over the porch presenting an obvious danger to the children. (N.T. 24). Another danger presented to these small children was chemical cleaning agents left out in the open. (72–73).

Of even greater concern than the disorganized, if not dangerous, condition of the home was mother's total neglect of the children's most basic needs and her consistent failure to supervise them. (N.T. 6, 50, 51). For example, mother did not even have a grasp of basic things like meal preparation and grocery shopping. (N.T. 15). There were numerous occasions when the children were not fed. (N.T. 26, 27). On one such occasion, the children had been left unattended for hours and had not eaten all day by 6:00 p.m. (N.T. 27). The children attempted to feed themselves by cooking something in the microwave, but not knowing how to properly use the microwave, accidentally caused a fire in it. (*Ibid*).

Mother would leave children unattended for prolonged periods. (N.T. 6, 7, 50). For example, she would go to a neighbor's house for several hours at a time without checking on the children. (*Ibid.*) On one occasion the children were left unattended, one of the children came within inches of being hit by a car just as CYSS caseworkers were arriving for a home visit. (N.T. 50–51).

Mother also failed to maintain adequate housing for the children. Mother's landlord informed Caseworker Horner in August, 1998, mother was being evicted for nonpayment of rent and the deplorable conditions of the property. (N.T. 27, 28). Mother also received several notices her electric service was to be terminated for nonpayment, the last notice being received in August, 1998. (N.T. 28).

Mother's continued failure to follow her CYSS service plan was another factor necessitating the filing of dependency petitions. For example, CYSS had reiterated to mother numerous times the importance of keeping the children away from Christine Kyle who had spent time in prison for molesting prepubescent boys. (N.T. 49–50).[2] However, mother blatantly violated her service plan by allowing Christine Kyle to actually live in the trailer with her and the children and was brazen enough to take Ms. Kyle to a joint meeting with all the agencies providing services to Mother. (N.T. 22, 48, 52, 58–60). Mother's only explanation for allowing Ms. Kyle to live with her and the children was she believed Ms. Kyle had been "cured" of pedophilia while in prison. (N.T. 48).

Father voluntarily remained out of the picture since the children were born. Prior to the filing of the dependency petitions, father never asked mother to send the children to him, never had contact with CYSS and never initiated a custody action based upon his ability to care for the children and mother's obvious inability to do so.

---

[1]23 Pa.Con.Stat.Ann. § 2511 provides grounds for involuntary termination of parental rights. One such ground is where "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Therefore, father's parental rights could have been terminated had an involuntary termination of parental

rights petition been filed at any time prior to the trip to Sea World in August, 1998.

[2] Ms. Kyle is mother's mentally retarded and emotionally disturbed niece. She pled guilty to statutory rape and three (3) counts of corruption of minors on June 22, 1992, as part of a plea agreement in which other charges were not prossed. She admitted to the allegations in an interview with a CYSS caseworker prior to the filing of charges. The ages of the three (3) victims were six (6), seven (7) and nine (9). This court obtained this information from the presentence investigation and various psychological evaluations contained in Ms. Kyle's criminal file with this court at Criminal Action No. 163 of 1992.

Trial Court Opinion, 3/2/99, at 2–4.

¶ 4 Appellants' sole argument on appeal is that the trial court erred in adjudicating B.B. and M.S. dependent children since there was no evidence presented that "Father was not immediately willing and able to provide the children with proper parental care and control." Appellants' brief at 5.

 ¶ 5 Our standard of review in dependency cases is well established.

The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In the Matter of C.R.S.*, 696 A.2d 840, 843 (Pa.Super.1997) (quoting *In re: R.R.*, 455 Pa.Super. 1, 686 A.2d 1316, 1317 (1996)).

¶ 6 In support of their position, Appellants rely upon cases in which the trial court either failed to consider the capability of the noncustodial parent, *e.g., In the matter of Mark T.*, 296 Pa.Super. 533, 442 A.2d 1179 (1982), or erroneously determined a child was dependent when the non-custodial parent was *capable* of providing the requisite care, *see e.g., In the*

*Interest of Justin S.*, 375 Pa.Super. 88, 543 A.2d 1192 (1988).

¶ 7 Appellants misrepresent the evidence and misinterpret the law in making their argument. All of the cases cited by Appellants concern the court's ability to make a finding of dependency when the noncustodial parent is available immediately to provide proper parental care and control. The polestar of their argument is that since CYS did not provide evidence that Father *could not* provide proper care, the children could not be declared dependent.

¶ 8 To address this issue, we must keep in mind the particular facts of this case. This is not a case where the father is actively involved in his children's lives, nor is it one where the father is uninvolved but has a physical presence. In fact, this case is not one where the father is a once-a-week, month, or year visitor. Father virtually is a stranger to these boys. Throughout the five years CYS has been providing services to Mother and the boys, there is no evidence that CYS even knew this man existed until after it filed the petitions for dependency. N.T., 11/23/98, at 28, 56. This trial court did not fail to consider evidence that Father could provide proper parental care to the children. Rather, it determined that the fact that he is completely unknown to the children prevents his designation as a proper parental caregiver to them. We cannot say this conclusion is erroneous.

¶ 9 The trial court addressed the issue in its opinion, and we adopt its reasoning as our own.

> In the case at bar, father has never had a relationship with the children, seeing them only once during their lives. Although he says he is *willing* to provide proper parental care ... he has not shown he is *capable* of doing so. Rather, he decided to completely ignore his parental responsibilities altogether, whereas Mother attempted to care for the children but failed. We recognize it is the petitioner's burden to show by clear and convincing evidence father is incapable of providing proper parental care. We feel this has been demonstrated by father's conscious decision not to parent these children.

> Essentially, father is saying he is "a fit parent by default" in that his absence from the children's lives has prevented CYSS from knowing anything about him, good or bad. As such, CYSS was unable to produce any evidence concerning father's inability to provide proper parental care for the children because he has chosen to be a non-factor in the children's lives and, thus, has had no contact with CYSS. We feel father's choosing to be a stranger to his children, taking no responsibility for their care and the fact his parental rights could possibly have been terminated demonstrate proper parental care is not immediately available from him.

> Furthermore, this court could not in good conscience turn the children over to a strange man rather than a known foster family. Because of his absence from his children's lives, we know nothing about his character, habits, reputation, morals or child-care abilities. All we know about him is he impregnated mother on two occasions and then decided not to be involved in the children's lives.

Trial Court Opinion, 3/2/99, at 7–8.

¶ 10 Contrary to Appellants' position, then, this case does not involve a dearth of evidence to support a conclusion that Father could *not* provide proper parental care, there is sufficient evidence that he cannot do so. The trial court clearly acted properly in declaring the children dependent.

¶ 11 Order affirmed.