J-A22040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.L., FATHER | : | No. 215 MDA 2016 |

Appeal from the Dispositional Order December 31, 2015
In the Court of Common Pleas of Lancaster County
Juvenile Division at No(s): CP-36-DP-0000197-2015

BEFORE:  GANTMAN, P.J., PANELLA, J., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:          **FILED SEPTEMBER 13, 2016**

Appellant, J.L. ("Father"), challenges the order entered in the Lancaster County Court of Common Pleas, which adjudicated B.L. ("Child") a dependent child and placed him in the custody of the Lancaster County Child and Youth Social Service Agency ("Agency").  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Father raises the following issues:

> DID THE COURT ERR IN FINDING THAT [CHILD] IS A VICTIM OF CHILD ABUSE AND THAT FATHER IS A PERPETRATOR OF ABUSE, AS FATHER DID NOT CAUSE THE INJURY TO [CHILD OR] KNOW THE CAUSE OF THE INJURY TO [CHILD], AND THERE IS NO EVIDENCE THAT FATHER ACTED INTENTIONALLY, KNOWINGLY OR RECKLESSLY CONCERNING HIS CHILD OR PLACING HIS CHILD AT RISK?

DID THE COURT ERR IN FINDING THAT [CHILD] IS A DEPENDENT CHILD, AS [CHILD], BOTH PARENTS, AND THE SIBLING OF [CHILD] WERE A FAMILY UNIT THAT WANTED FOR NOTHING AND POSED NO RISK TO THE HEALTH, SAFETY AND WELFARE OF [CHILD]?

SHOULD THE COURT PROPERLY HAVE GIVEN CREDIBILITY TO THE TESTIMONY OF THE PARENTS AS OPPOSED TO THE TESTIMONY OF THE NURSE PRACTITIONER THAT TREATED [CHILD], AS THE TESTIMONY OF THE PARENTS WAS CONSISTENT, BUT DURING HER TESTIMONY THE NURSE PRACTITIONER OFFERED TWO DIFFERENT DESCRIPTIONS OF THE SPECIFIC TREATMENT THAT SHE ATTEMPTED TO ADMINISTER TO [CHILD]?

SHOULD THE COURT PROPERLY HAVE DISREGARDED THE TESTIMONY OF THE EXPERT WITNESS OFFERED BY THE AGENCY, AS THE OPINION OF THE EXPERT WITNESS WAS SPECULATIVE AND BASED UPON HOSPITAL RECORDS OF DUBIOUS ACCURACY GIVEN THE INCONSISTENT TESTIMONY PRESENTED BY THE NURSE PRACTITIONER THAT TREATED [CHILD] AT THE HOSPITAL?

(Father's Brief at 8-9).

The applicable scope and standard of review for dependency cases is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting *In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)).

We accord great weight to this function of the hearing judge because [the court] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [the court]. Relying upon [the court's]

- 2 -

unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa.Super. 2000) (quoting *In re B.B.,* 745 A.2d 620, 622 (Pa.Super. 1999)) (citations omitted). *See also In re L.Z.*, ___ Pa. ___, ___, 111 A.3d 1164, 1174 (2015) (reiterating standard of review in dependency cases requires appellate court to accept trial court's findings of fact and credibility determinations if record supports them, but appellate court is not required to accept trial court's inferences or conclusions of law); *In re D.P.*, 972 A.2d 1221, 1225 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (stating applicable standard of review in dependency cases is "abuse of discretion"). Further, in placement and custody cases involving dependent children:

> The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re S.G.*, 922 A.2d 943, 947 (Pa.Super. 2007).

The Child Protective Services Law defines "child abuse," in relevant part, as follows:

**§ 6303. Definitions**

**(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

>> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> * * *

23 Pa.C.S.A. § 6303(b.1)(1).

The existence of "child abuse" pursuant to Section 6303(b.1) must be proven by clear and convincing evidence. **In re L.Z., supra**. Under certain circumstances, however, the identity of an abuser may be established by *prima facie* evidence. **Id.** **See also In re L.V.**, 127 A.3d 831, 837-38 (Pa.Super. 2015).

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

**In re L.Z., supra** at ___, 111 A.3d at 1185 (internal footnote omitted).

Significantly, courts do not require a parent's physical presence during the injury for "abuse" to occur. **Id.** at ___, 111 A.3d at 1184. To the contrary, our Supreme Court has stated, "parents are always responsible for their children, absent extenuating circumstances…." **Id.** Moreover, "[t]he inclusion of 'omissions' encompasses situations where the parent or

responsible person is not present at the time of the injury but is nonetheless responsible due to his...failure to provide protection for the child." ***Id.***

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Jay J. Hoberg, we conclude Father's issues merit no relief. The trial court's opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Trial Court Opinion, filed April 4, 2016, at 1-11) (finding: **(1)** at time of injury, Child was six months old; on day of injury, Child was not moving his injured arm, necessitating visit to emergency room; nurse practitioner who treated Child during emergency room visit initially believed injury was "nursemaid's elbow" and performed reduction procedure; after reduction, Child was still unable to use arm and cried in pain when arm was moved; X-rays revealed Child had suffered spiral fracture of humerus, which is commonly caused by twisting; Dr. Kathryn Crowell, expert in pediatrics with specialty in child abuse, who evaluated Child, established Child's injury caused Child significant, ongoing pain; spiral fracture caused Child substantial pain and impaired Child's physical functioning; Father initially stated Child was fine before napping in Child's swing on day of injury; Child's parents later stated injury could have been caused by Child "dancing" with his four-year-old half-sister; Child's parents also stated nurse practitioner's initial treatment caused Child's injury; clear and convincing evidence demonstrated Child's injury was result of child abuse; Dr. Crowell

established that Child's parents' explanations for injury were implausible and would not have resulted in type of injury Child sustained; Dr. Crowell explained it was extremely unlikely that four-year-old half-sister could have caused Child's injury; Child's injury was present before treatment; Child's parents' explanations for injury were inconsistent, evasive, and lacked credibility; testimony of nurse practitioner and Dr. Crowell was credible and persuasive; Child's injury satisfied definition of "child abuse"; Child's parents were Child's only caregivers in days leading up to Child's injury; *prima facie* evidence demonstrated Child's parents were perpetrators of child abuse; Child's parents' explanations for Child's injury were inconsistent with medical evidence; Child's parents' rebuttal did not outweigh totality of credible evidence and medical records; **(2)** clear and convincing evidence showed Child was abused and without proper parental care; Child's injury would not have occurred but for Child's parents' acts or omissions; Child, therefore, is dependent child; **(3)** exhibits on record, together with medical testimony, provided accurate timeline of events; testimony of nurse practitioner was credible and persuasive; nurse practitioner routinely and successfully performed treatment she performed on Child; Child's parents' testimony was evasive and lacked credibility; Child's parents did not provide consistent explanation for Child's injuries that fit with medical evidence; Child's parents were unable to answer specific questions on when injury occurred; **(4)** Dr. Crowell conducted separate exam of Child, met with Child's parents, ordered

new X-rays, and reviewed records of Child's emergency room visit; nurse practitioner's testimony and emergency room records were credible; Dr. Crowell's testimony established when she met with Child's parents, they did not allege Child's half-sister caused injury, but stated they believed nurse practitioner caused injury; Dr. Crowell testified nurse practitioner's treatment would not have caused Child's injury; totality of substantial medical evidence concerning Child's injuries was compelling and outweighed Child's parents' inconsistent and inconclusive testimony). The record supports the court's dependency decision. Accordingly, we affirm on the basis of the trial court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/13/2016

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
JUVENILE COURT DIVISION

IN RE:                       :

      B.L.                  :        CP-36-DP-197-2015

                       :

## OPINION SUR APPEAL

On October 1, 2015, the Lancaster County Children and Youth Social Service Agency (hereinafter "Agency") filed a Petition for Temporary Custody of B.L. (hereinafter "B.L."). B.L. is a minor male child who was born January, 2015. Hearings were held on October 2, 2015, and December 21, 2015. The Agency requested that B.L. be found a dependent child and a victim of abuse. The Agency also requested that child's mother, E.L. (hereinafter "Mother"), and child's father, J. L. (hereinafter "Father")(collectively "Parents"), be found to be the perpetrators of B.L.'s abuse. On December 21, 2015, the Court found B.L. to be both a victim of abuse and a dependent child, and found Mother and Father, as the child's primary caregivers, to be perpetrators of abuse against B.L.

Mother filed a timely Notice of Appeal on February 1, 2016[1], and asserts three issues in her 1925(b) statement. Father also filed a timely Notice of Appeal on February 1, 2016, and asserts four issues in his 1925(b) statement. The cases were consolidated and this Opinion Sur Appeal address both Statements of Errors Complained of on Appeal.[2] Parents first argue that the Court erred in finding the child to be an abused child and that Parents were the perpetrators of that abuse. Parents further maintain that they did not injure the child nor do they know how or

---

[1] The Court issued a decision on the record following the December 21, 2015, hearing and signed the Adjudication/Disposition Order the same day. However, the actual Order was not served on the parties because of the Christmas holiday until December 31, 2015.

[2] In their respective State of Errors Complained of on Appeal, Parents both argue the same first two issues. The Court will address these together. Mother's issue three and Father's issues three and four are also similar and will be fully addressed together.

1

when the child was injured and, therefore, there is no evidence that they intentionally, knowingly or recklessly placed B.L. at risk for harm. Next, Parents argue that the Court erred in finding B.L. to be a dependent child because Mother and Father provided a safe, clean and loving environment.

Mother then argues that the Court erred in relying on the medical testimony and hospital records because that evidence was inconsistent and was of questionable accuracy. Likewise, Father argues that the Court improperly assigned credibility to the medical and expert testimony rather than assigning credibility to Parents' testimony. Father also argues that the Court failed to properly disregard the testimony of an expert witness who reviewed the LGH records.

The relevant facts are summarized as follows. On August 2, 2015, the Agency received its first report on the family. Parents arrived at Lancaster General Hospital's Emergency Department (LGH) with concerns when B.L. woke up from a nap and was not moving his right arm. Mother told the LGH Nurse Practitioner, Kara Garber, that she though his arm had fallen asleep, but had called B.L.'s pediatrician who suggested it might be a nursemaid's elbow and recommended Parents take B.L. to the ER. Notes of Testimony (N.T.), Adjudication and Disposition Hearing, 12/21/15, 47. Based on Mother's statements and her own observations, Ms. Garber first believed the injury to be a nursemaid's elbow.[3] N.T. at 10:10-22. Ms. Garber then attempted a reduction, the common treatment for that type of injury.

After the reduction, B.L. still exhibited an inability to use his arm and cried in pain when his arm was moved. Ms. Garber determined it was not a nursemaid's elbow because doing the reduction procedure itself would not cause pain unless the child's elbow was, in fact, dislocated

---

[3] "A nursemaid's elbow is a radial head subluxation of the radial bone at the blow joint, and so what can happen is it can just become subleuxed [sic] or partially dislocated and the child won't move their arm. The kind of just hold their arm in an uncomfortable position until it is successfully reduced." N.T. at 10:10-22.

2

or child suffered some other injury. N.T. at 31. She then ordered X-Rays. The X-rays showed that B.L. had a spiral fracture of his right humerus, which is commonly caused from a twisting of that area. N.T. at 14. The X-Rays also showed a possible fracture of the distal ulna, the wrist area, of the same arm. Id. At that time, Parents denied knowledge of any recent injury or trauma. A spiral type fracture is considered suspicious if no trauma or fall is reported and the child is not mobile. N.T. at 56:6-9. Because there was no explanation given for how the child could have injured his arm, Ms. Garber consulted Dr. Dumornay, the supervising ER physician, with concerns of child abuse. N.T. at 15. The concern was reported to ChildLine, and the Agency and Police began investigating the report.

Parents' testimony placed them as the only two caregivers for the child for the days leading up to the injury. Following the X-Rays, Ms. Garber once again asked the Parents if any trauma could have caused the injury. N.T. at 15-16. Mother then stated the injury might have been caused by B.L.'s four year old half-sister,        who would take B.L.'s arms and dance with him while he was in his roller chair. Ms. Garber testified that this explanation was inconsistent with Child's injuries:

> She's four, it would be, you know, unusual for a four year old to inflict any injury such as that on another child. And again, it would depend how she was holding his arm, how he responded thereafter. He should have been immediately symptomatic thereafter. I think it unlikely.

N.T. at 49:23-25, 50:1-2. B.L. was placed into a splint and given Tylenol with codeine for pain control. Dr. Dumornay discharged and sent B.L. home with Parents. N.T. at 28.

The Agency then implemented a Family Safety Plan (FSP) prohibiting any unsupervised contact between Parents and B.L.        The children were to reside with Paternal Grandparents. Following the implementation of the FSP, Parents provided two explanations to the caseworker for the injury:

3

> The explanations that were provided to me were that day [half-sister] was dancing with the child and they believed caused the injury. I explained to them after speaking with medical professionals that ... that was not a plausible explanation. And then at that point, that's when they had stated that they believed that the injury had been caused by the nurse when she had attempted the nursemaid's elbow.

58:7-14. At the time of the Shelter Care hearing, the criminal and child abuse investigations regarding B.L.'s injuries remained ongoing.

On September 17, 2015, B.L. was seen by Dr. Kathryn Crowell at Penn State Hershey Children's Hospital. Dr. Crowell works with a child protective team, a group of pediatricians and a social worker and psychologist who see children for suspected abuse and neglect. She is an expert in the field of pediatrics, with a specialty in the field of child abuse. Dr. Crowell and her team evaluated B.L. in an outpatient setting, met with Parents, obtained medical history, reexamined B.L., reviewed the record from LGH and took another X-Ray of the injury. Dr. Crowell determined that B.L.'s injury was consistent with physical abuse. Dr. Crowell testified that when she met with Parents, they did not allege another child had caused the injury. At that time, Parents indicated that they believed Ms. Garber was responsible for B.L.'s spiral fracture. Dr. Crowell testified that she told Parents that a reduction would not cause a spiral fracture. Father then showed Dr. Crowell how Ms. Garber had performed the reduction. Dr. Crowell testified that Father's demonstration also would not have resulted in the twisting of the humerus and could not have caused the injury. N.T. at 39.

On October 1, 2015, the Agency completed its abuse investigation, and indicated Mother and Father as perpetrators of abuse. At that time, the Agency petitioned the Court for emergency placement of B.L. to assure his safety and well-being. B.L. was placed into the physical custody of the Agency on October 1, 2015.

4

At the adjudication/disposition hearing on December 21, 2015, the Agency offered the testimony of Ms. Garber, Dr. Crowell and Elan Roth, the Agency caseworker. The Court found the Child to be a victim of physical abuse as defined in 23 Pa. C.S.A §6303 and found Parents were the perpetrators of that abuse. The Court also found B.L. dependent and entered a disposition approving a child permanency plan with the primary goal of reunification with Parents. Parents have appealed the December 21, 2015, Order of Adjudication and Disposition.

Parents first argue the Court erred in finding B.L. to be an abused child and finding Parents the perpetrators of that abuse. In deciding whether Parents were perpetrators of abuse to the Child, the Court first established that the Child's injuries constituted abuse. Where child abuse is alleged in a dependency case, the Child Protective Services Law (CPSL) and the Juvenile Act (Act) must be construed and applied together. The Act is a procedural act giving the Court jurisdiction over and the authority to make dependency findings, including whether or not a child has been abused. The primary purpose of the CPSL is to provide for the quick and effective reporting of suspected child abuse and to serve as a vehicle for providing protective services to prevent any further abuse. In Interest of J.R.W., 428 Pa. Super. 597, 631 A.2d 1019 (1993).

In resolving abuse allegations, the Court must refer to the definitions provided in both the Act and the CPSL. The CPSL defines "child abuse", in part, as, "intentionally, knowingly or recklessly doing any of the following: (1) causing bodily injury to a child through any recent act of failure to act." §6303(b.1)(1). "Bodily injury" is defined as "impairment of physical condition or substantial pain." §6303(a). "Intentionally," "knowingly" and "recklessly" are terms defined in 18 Pa.C.S. §302 (relating to general requirements of culpability). "Perpetrator" is also defined as "a person who has committed child abuse as defined in this section," and can be a parent of

5

the child. Id. When determining whether child abuse occurred, innuendo and suspicion alone are not enough to compel a finding of child abuse. Matter of Read, 693 A.2d 607 (Pa. Super. 1997). Instead, the abuse must be established by clear and convincing evidence. Id.

The record supports and the Court found by clear and convincing evidence that the injuries that B.L. sustained impaired his physical condition and resulted in substantial pain, pursuant to Section 6303(b.1). Parents testified the Child was not moving his arm, necessitating the visit to LGH. The X-Rays revealed B.L. suffered a spiral fracture of his humerus, which impaired his physical functioning and explained his unwillingness to use his arm. Dr. Crowell testified that in addition to B.L.'s inability to move his arm, the injury that caused a spiral fracture, would have caused significant, on-going pain. It is clear, B.L. suffered substantial pain from his spiral fracture. He would not move his arm and cried when other's tried to move it. Furthermore, an analysis of the record reflects the substantial evidence presented in support of this Court's finding that B.L.'s injuries satisfied the definition of "child abuse" and the identity of the parents as the perpetrators of that abuse. Evidence of the requisite intentional, knowing, or reckless act causing bodily injury can be established through circumstantial evidence of sufficient quantity and quality. Malice need not be proved to establish child abuse. This circumstantial evidence is more fully discussed in the next part of this opinion.

The Superior Court has long recognized the applicability and importance of the evidentiary presumption in Section 6381(d) regarding the identity of the abuser. While the Agency has the burden of proving the existence of child abuse by clear and convincing evidence, the identity of the perpetrator of that abuse need only be established through prima facie evidence in certain circumstances. §6341(c). 23 Pa. C.S.A. § 6381(d) provides:

> Evidence that a child suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omission of the parent or other

6

person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent of other person responsible for the welfare of the child.

§6381(d); B.B. v. Department of Public Welfare, 17 A.3d 995; C.S. v. Department of Public Welfare, 972 A.2d 1254.

When a child is in the care of multiple parents, both parents are accountable for the care and protection of the child, whether they actually inflict the injury or failed in their duty to protect the child. Prima facie evidence is sufficient to establish that the parent perpetrated that abuse unless the parent rebuts the presumption. Pennsylvania case law states that the presumption satisfies the intent element unless the prima facie evidence is successfully rebutted. In the Interest of L.Z., 111 A.3d 1164 (Pa. 2015). Parents may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility to another person or the injuries were accidental rather than abusive. Evaluation of the validity of presumption then rests with the trial court to weigh the credibility of the prima facie evidence presented by the Agency and the rebuttal of the Parents. Id.

The record shows that Parents were B.L.'s sole caregivers the days leading up to his injury. Mother testified that B.L. was fine before napping in his swing the day of the injury. She testified that she left the Child alone with Father for about an hour while she showered and helped a neighbor. She further testified that upon returning to the living room, Father called her attention to Child's injury. Parents do not argue any other individuals were caring for B.L. during that time.

Moreover, the Court found neither of Parents' explanations for B.L.'s injury to be credible. They failed to rebut the presumption. Dr. Crowell testified that neither of the explanations Parents gave would have resulted in the type of injury B.L. sustained. It was extremely unlikely that a four year old child would be able to cause the injury given the amount

7

of force necessary to cause a spiral fracture. Moreover, even if the four year old had caused the spiral fracture, B.L. would have resulted in the impairment of his arm and cried out immediately from pain. According to Parents, it was only after his nap that they noticed B.L. wasn't using his arm. Therefore, the Court did not find the explanation that Child's sibling inflicted the injury credible.

Upon being told that their first explanation was inconsistent with the medical evidence, Parents then accused the LGH Nurse Practitioner, Ms. Garber, of causing the injury. It is not contested that B.L. displayed symptoms of an injury to his arm prior to his visit to LGH. The Parents' account indicates that B.L. wasn't using his arm and that he cried when his arm was moved. The record is quite clear that B.L.'s injuries were present prior to Ms. Garber's reduction. Even after the reduction was attempted, B.L. continued to cry. This suggested to Ms. Garber that it was not a nursemaid's elbow. After reviewing the X-Rays, it was determined that the pain was caused from the spinal fracture.

After again being told his explanation was not consistent with the medical evidence, Father then testified in an attempt to blame Ms. Garber. Contrary to all the other evidence in the record, Father testified that B.L. was so upset by Ms. Garber's presence that he would cry when she was around but did not cry any other time. Father also testified that the child was comfortable during the second attempt at reduction performed by Dr. Dumornay, and was fine immediately afterward. Ironically, these were the exact behaviors Ms. Garber indicated in her testimony that a Child would display before and after a successful reduction. The Court infers that Father is implying Ms. Garber performed the reduction incorrectly and the doctor performed the reduction correctly. However, the Court does not follow Father's logic. Specifically, if the Court were to believe Father that Ms. Garber caused the spiral fracture during the reduction, then

8

B.L. would not be calm during the second reduction, but instead would be in pain from that new injury.

Ms. Garber routinely and successfully performed reductions approximately once a week and treats them using the same method. Furthermore, Dr. Crowell testified that a spiral fracture would not occur from an ordinary reduction. Parents' attempts to shift the blame lacks any credible explanation for B.L.'s injuries.

Therefore, the Court found that clear and convincing evidence was presented that the injuries the Child sustained were the result of child abuse. The injuries could not be acceptably explained away by his parents. The medical evidence established that the Child's injuries were non-accidental and were consistent with child abuse. The totality of the record establishes by clear and convincing evidence that the injuries were either intentionally or knowingly or recklessly inflicted on the Child. Prima facie evidence was presented as explained above that Mother and Father were perpetrators of the abuse.

Parents also appeal the finding of dependency. The Courts have held that "A finding of abuse may support an adjudication of dependency." In re C.R.S., 696 A.2d 840, 843 (Pa. Super. 1997). That is exactly the basis for the Court's decision. Parents argue that they did not cause the abuse and posed no risk to the child, and therefore, a finding of dependency was made in error. The Court again disagrees. The totality of the record establishes that clear and convincing evidence that B.L. was a victim of child abuse as defined in the statute. "The fact that his parents express bewilderment over the cause of his injuries does not obviate their responsibility." In the Interest of J.O.V., 454 Pa. Super. 630, 686 A.2d 421, 423 (1996). In determining whether there exists proper care, equal weight is given to acts and omissions since parental duty includes protection of child from harm §6302(1).

9

In determining dependency, the Court's primary consideration was the safety and health of the Child, the victim of the physical abuse. Clear and convincing evidence existed that the Child was abused and without parental care and that Child's injuries would not have occurred but for Parents' acts or omissions as his primary caregivers. The record supports the Court's finding that B.L. is a dependent child.

Parents also argue that Ms. Garber's testimony was contradictory and questionable. The Court examined the exhibits admitted to the record to gain a more accurate timeline in instances where testimony was unclear. Despite Parents arguments to the contrary, the Court found the testimony of Ms. Garber and Dr. Crowell to be credible and persuasive. In contrast, the Court found Parents' testimony to be evasive and lacking credibility. Parents were unable to provide a consistent explanation for B.L.'s injuries that would fit with the medical evidence. They were unable to answer any specific questions on when the original injury occurred. And they attempted to blame others once they discovered the medical evidence rejected their prior explanation.

Furthermore, Father argues that Dr. Crowell's testimony should be disregarded because it was based on speculation and LGH records. Father's argument simply ignores that Dr. Crowell and her team conducted a separate exam of Child, met with Child's parents and even ordered new X-rays, in addition to reviewing LGH records. To be clear, while the Court did find Ms. Garber's testimony and the LGH records credible, it did not rely solely on the statements provided by Ms. Garber in rendering its opinion. The Court relied on the totality of the substantial medical evidence concerning the child's injuries. "Substantial evidence" is defined under 23 Pa. C.S. §6303 as "evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." The totality of the credible

10

and relevant medical evidence in this record is compelling and outweighs the inconsistent and inconclusive testimony received from the parents.

Based upon the evidence presented and having resolved all issues of credibility, the Court found for the above stated reasons, that the Agency established by clear and convincing evidence that B.L. was an abused child and that B.L. is a dependent child. Furthermore, the record establishes that the Parents were the perpetrators of his abuse. All issues raised by Mother and Father in their respective 1925(b) statements have been fully addressed. The Court's determination that the Agency met its burden and the Order of Adjudication and Finding of Abuse should be affirmed. The Clerk of Courts is directed to transmit the record to the Superior Court.

BY THE COURT:

Date: _April 1, 2016_

_____
JAY J. HOBERG, JUDGE

ATTEST:

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

Copies to:  David Natan, Esq.
Albert J. Meier, Esq.
Patricia Dunlevy-Williams, Esq.
John P. Stengel, Esq.
Children and Youth Agency (2)
    E. L., Mother
    J. L., Father

_____
Jacquelyn E. Pfursich
Clerk of Courts

11