J-S56032-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.C., MOTHER | : | No. 771 MDA 2018 |

Appeal from the Order Entered April 11, 2018
in the Court of Common Pleas of Susquehanna County
Juvenile Division at No(s):  CP-58-DP-0000010-2018

BEFORE:  GANTMAN, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED NOVEMBER 20, 2018**

L.C. appeals from the Order adjudicating her minor, biological son, D.T. ("Child"), born in March 2011, dependent, pursuant to 42 Pa.C.S.A. § 6302. We affirm.

The trial court set forth the following procedural and factual history:

On March 29, 2018, Susquehanna County Children and Youth Services (CYS) filed a shelter care application related to … [Child] based upon the results of an investigation that revealed:  (1) poor living conditions in his home that included dog urine and feces on the floors; and (2) five separate adult individuals within the home testing positive for the use of controlled substances.  [Child] was residing in the home of his legal guardian, [C.T.], whom [Child] considered to be his mother.  The [trial] court granted the shelter care application.

A shelter care hearing was conducted on April 2, 2018.  The court determined that sufficient basis existed to continue the placement of [Child].  On April 3, 2018, CYS filed a dependency [P]etition relative to [Child].  On April 10, 2018, the court conducted a dependency hearing.  [Child's] biological mother, [L.C.], appeared at the dependency hearing and was represented by legal counsel.

At the [dependency] hearing, the history of [Child] was revealed. When [L.C.] discovered that she was pregnant with [Child], she had considered having an abortion. [C.T.] was [L.C.'s] close friend and convinced her not to have an abortion[,] because [C.T.] wanted a child. As a result, [L.C.] gave birth to [Child] and thereafter turned him over to [C.T.,] and [Child] considers [C.T.] to be his mother. [Child] does have a relationship with [L.C.,] and considers her to be an "aunt." [L.C.] lives in South Carolina and she appeared for the dependency hearing. [L.C.] indicated that she was willing to take custody of [Child] and transport him back to South Carolina. [L.C.] testified that she intended to return [Child] to [C.T.] after [C.T.] had straightened her life out.

Given the short period of time[,] as well as the jurisdictional issue,[1] CYS had not investigated [L.C.] as a placement resource. CYS advocated continued placement of [Child] in foster care[,] while [L.C.] argued no dependency existed[,] as a willing and able parent was available to care for [Child, *i.e.*, L.C.]. There was no dispute that [C.T.] lacks the ability to provide adequate care for [Child]. The [trial] court found [Child] to be a dependent child and continued the placement in foster care.

Trial Court Opinion, 6/19/18, at 1-2 (footnote added).

On April 11, 2018, the court entered the subject Order adjudicating Child dependent. The Order conferred legal custody to CYS, and directed that Child shall be placed in the physical custody of L.C. "after finalization of any

---

[1] As we discuss in detail below, the jurisdictional issue identified by the trial court involves the Interstate Compact on the Placement of Children ("ICPC"), set forth at 62 P.S. § 761. The ICPC is an agreement among the states, the District of Columbia, and the Virgin Islands to cooperate with each other in the interstate placement of children. **See id.**, at Article I (providing, in relevant part, that "[e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.").

requirements imposed by the [ICPC,]" but, ordering further that, "[p]ending finalization of the interstate transfer requirements, [] [C]hild shall remain in his current foster care placement." Order, 4/11/18, at 3.[2] L.C. then timely filed a Notice of Appeal,[3] followed by a Concise Statement of errors complained of on appeal.

L.C. presents the following issues for our review:

1. Did the [t]rial [c]ourt commit an abuse of discretion and reversible error by finding that … [Child] was a dependent child[,] when the evidence did not establish by clear and convincing evidence that [Child] is a dependent child based upon the evidence presented at [the dependency] hearing?

2. Did the [t]rial [c]ourt commit an abuse of discretion and reversible error when the [t]rial [c]ourt determined that [Child] is a dependent child[,] when the evidence of record established that there was a non-custodial parent who was ready, willing, and able to provide proper care, supervision, and parental control for [Child]?

Brief for Appellant at 3 (issues numbered).

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

_____

[2] Additionally, the trial court's Order stated, *inter alia*, that Child was "adamant that he wants to remain in the foster home[,]" Order, 4/11/18, at 6, and a permanency review hearing would take place in three months. *Id.*

[3] C.T. did not file a separate appeal, nor has she participated in this appeal.

The Juvenile Act defines a dependent child, in relevant part, as a child who

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

This Court has explained that "the dependency of a child is not determined 'as to' a particular person, but rather must be based upon two findings by the trial court: whether the child is currently lacking proper care and control, and whether such care and control is immediately available." *In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010) (citations omitted).

"The petitioner bears the burden of proof in a dependency hearing, and must prove by clear and convincing evidence that (1) the child is presently without proper parental care or control; and (2) such care and control is not immediately available." *In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003) (citation and internal quotation marks omitted). Further, the Pennsylvania Supreme Court has held that "where a non-custodial parent is ready, willing[,] and able to provide adequate care to a child, a court may not adjudge that child dependent." *In re M.L.*, 757 A.2d 849, 851 (Pa. 2000). However, a non-custodial parent's willingness is irrelevant if she or he has never parented the child. *See In re B.B.*, 745 A.2d 620, 623 (Pa. Super. 1999) (holding that

- 4 -

"[t]he fact that [father] is completely unknown to the children prevents his designation as a proper parental caregiver to them.").

While L.C.'s Statement of Questions Involved sets forth two issues, her Argument section sets forth only one issue, asserting that the trial court erred because the evidence of record does not support a finding of dependency. **See** Brief for Appellant at 8-9. L.C. does not contest that the conditions in C.T.'s home support a finding of dependency.[4] Instead, L.C. argues that "[a] finding of dependency cannot be made where the non[-]custodial parent is ready, willing, and able to provide the child with proper parental care and control." **Id.** at 10. L.C. asserts that CYS "did not have any evidence that [L.C.] was incapable of providing appropriate care, supervision, and control for … [C]hild." **Id.** at 9. According to L.C., "[a]ll of the other evidence of record showed or tended to show that [L.C.] was capable of providing appropriate care and control for [Child]." **Id.** at 11; **see also id.** (wherein L.C. contends that the CYS caseworker assigned to the case, Raymond Totten ("Totten"), "admitted that he had no evidence that [L.C.] is an inappropriate caregiver or that she was unable to care for … [C]hild."). According to L.C., Totten "advocated for dependency based merely on the fact that he would like to have more information before placing [] [C]hild with [L.C.,]" **id.** at 9, which, L.C. asserts, is not enough.

---

[4] Indeed, L.C. acknowledged at the dependency hearing that Child does "not have a very good life right now." N.T., 4/10/18, at 81.

The trial court explained its rationale for adjudicating Child dependent

as follows:

> In this case, [L.C.] appeared at the dependency hearing seeking to have [Child] released to her custody so that she could remove [Child] from the Commonwealth and take him to South Carolina. *There was no opportunity for CYS to conduct any investigation whatsoever* as to whether [L.C.] was a ready, willing and able caregiver for [Child]. The record established that [L.C.] had a limited relationship with [Child,] to the point that [Child] considered her to be an "aunt[,]" but *there was no other evidence presented as to [L.C.'s] ability to adequately provide for [Child]*. Moreover, *CYS had no ability to conduct an independent investigation and had to rely upon a sister agency in South Carolina to do so.* Under the ICPC, South Carolina would have to approve any "placement" of [Child] with [L.C.] in South Carolina. 62 P.S. § 761. *No such approval had been obtained*.
>
> Moreover, the evidence demonstrated that the goal of permanency was promoted by [Child] remaining in Susquehanna County. First, [Child] had not finished his school year and the dependency [O]rder and placement into a foster home allowed him to complete his school year. Second, [L.C.] made clear that she did not inten[d] to keep [Child] and that she intended to eventually return [Child] to [C.T.] Relocating [Child] to South Carolina would not have served to provide permanency for [Child,] as *he would have been relocated again at some point in time*.
>
> Finally, if the court accepted [L.C.]'s argument and released [Child] to [L.C.], then *CYS would have lost the ability to monitor the situation and assure that [C.T.] was addressing her substance abuse problem[,] as well as making her home appropriate for [Child]*. Upon the termination of the dependency proceeding, [L.C.] could have returned [Child] to [C.T.] the following day and never actually returned to South Carolina.
>
> The approach of the majority of state courts to apply the ICPC to out-of-state non-custodial parents[5] is best suited to achieve the

---

[5] In this regard, we refer to a separate discussion in the trial court's Opinion. **See** Trial Court Opinion, 6/19/18, at 3-4 (collecting cases).

goals of protecting children from abuse and neglect. The [trial] court simply lacked the authority to conduct a *de facto* placement of [Child] with [L.C.] in South Carolina without following the dictates of the ICPC. Given that a placement review hearing was scheduled to occur within 3 months, the parties had time to accomplish the following: (1) to assure that [Child] successfully completed his school year; (2) to allow [C.T.], whom [Child] considered to be his mother, the opportunity to work to resolve the outstanding issues that led to the dependency; [and] (3) to allow [L.C.] and CYS the opportunity to work with South Carolina to verify that she was an appropriate placement resource in the event that [C.T.] was unable to achieve substantial compliance.

Trial Court Opinion, 6/19/18, at 4-6 (emphasis and footnote added, footnotes in original omitted).

The evidence at the dependency hearing revealed that L.C. had placed Child with C.T. shortly after his birth in 2011. N.T., 4/10/18, at 44. L.C. testified that she was essentially a "surrogate mother," and her intent was that C.T. would raise Child as his mother. *Id.* at 58, 61-62, 82. L.C. claimed to have a verbal agreement with C.T. that if C.T. could not care for Child, L.C. would care for him until C.T. could. *Id.* at 61-62. Child has lived with C.T. since June of 2011. *Id.* at 54.

At the time of the dependency hearing, Child was in first grade and had a history of significant behavioral issues at school involving aggression and disrespecting adults and authority figures. *Id.* at 5-7. His negative behaviors were escalating. *Id.* at 6. According to the principal at Child's school, Child had stated that he did not want to return to his "garbage house." *Id.* Child also had expressed concerns about drug use in the home. *Id.* at 6-7.

In 2018, CYS caseworker Totten received a request from South Carolina to investigate sexual abuse allegations involving abuse perpetrated against L.C.'s minor daughter in 2011. While investigating this allegation, Totten received an additional report regarding Child's behavior at school, as well as issues regarding Child's housing with C.T. in Pennsylvania, including poor living conditions, drug use in the home, and the presence of a sex offender in the home. *Id.* at 20-21. Totten visited the home and found five adults living there. *Id.* All, including C.T., tested positive for methamphetamine. *Id.* at 21-22. The condition of the home was deplorable, with dog feces and urine on the floor, no heat, and no food. *Id.* As a result of the conditions, Pennsylvania State Police took protective custody of Child. *Id.* at 22. L.C. claimed not to be aware of the condition of Child's home or the drug use. *Id.* at 65.

Prior to the dependency hearing, Totten drug tested L.C. *Id.* at 30. The test came back positive for methadone and amphetamine. *Id.* Totten acknowledged that the positive result for amphetamine could possibly be attributable to diet medication. *Id.* Additionally, L.C. had a prescription for methadone. *Id.* at 30-31. L.C. claimed to have used methadone since 2011. *Id.* at 63. She testified that she has been clean from abusing cocaine and opiates for seven years. *Id.*

Totten opined that L.C. could be an appropriate placement for Child, but he had concerns because he did not have time to study her household, and because he had previously received a report regarding sexual abuse of L.C.'s

daughter. *Id.* at 34. Totten was also aware of an investigation regarding L.C.'s daughter overdosing on L.C.'s methadone and needing to be treated with Narcan. *Id.* at 37. However, Totten believed that investigation would be closed as unfounded, and further acknowledged that he had no evidence that L.C. would be an inappropriate caregiver. *Id.* at 37-38.

With regard to the relationship between L.C. and Child, L.C. acknowledged that she has not physically seen Child since 2013. *Id.* at 68-69. Child never mentioned L.C. to his teacher or to a social worker assisting Child. *Id.* at 11, 15. Totten inquired of Child whether he knew who L.C. was by name, and Child informed him he did not, although he did know "Auntie L." *Id.* at 34, 124. L.C. acknowledged that Child knows her as "Auntie L.," and stated that she occasionally does a video chat with him. *Id.* at 61. L.C. stated that Child knows C.T. as "mommy." *Id.* at 78. According to L.C., she did not want to permanently remove Child from C.T.'s care. *Id.* L.C. testified that if C.T. "gets her act cleaned up[,]" L.C. would return Child to C.T.'s care. *Id.* at 78-79. Prior to doing so, L.C. stated, she would need to see "physical proof" that C.T. can provide Child an appropriate living environment. *Id.*

In adjudicating Child dependent, the trial court relied, in part, on the ICPC, believing that the court could not transfer custody of Child to L.C. without first complying with the ICPC because L.C. lives in South Carolina.

Relevant to our review, Article III(a) of the ICPC provides as follows:

> No sending agency shall send, bring or cause to be sent or brought into any other party state, any child for placement in foster care or as a preliminary to a possible adoption unless the sending

agency shall comply with each and every requirement set forth in this article[,] and with the applicable laws of the receiving state governing the placement of children therein.

62 P.S. § 761; *see also id.* at Article II(d) (defining "placement," in relevant part, as "the arrangement for the care of a child in a family, free or boarding home, or in a child caring agency or institution ….").  Additionally, Article V(a) states, in relevant part, as follows:

> The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have if the child had remained in the sending agency's state until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of appropriate authority in the receiving state.  …  The sending agency shall continue to have financial responsibility for support and maintenance of the child during the period of the placement.

*Id.*

Under these circumstances, the ICPC would not apply had the trial court denied CYS's dependency Petition and conferred custody upon L.C.  The court necessarily would have concluded Child was not dependent, ending its jurisdiction and supervision of Child.  Accordingly, L.C. would not be a "placement," under the ICPC.  This is in contrast to the current situation wherein the court adjudicated Child dependent and, subject to compliance with the ICPC, placed Child in the physical custody of L.C.

Despite the trial court's reliance on the ICPC, the court also noted its concern that L.C. was a virtual stranger to Child, and that L.C. intended to return Child to C.T.'s care once L.C. determined that C.T. was "back on her

feet." Child only knew L.C. as "Auntie L.," and had not physically seen her in five years. Given the limited contact between Child and L.C., coupled with L.C.'s expressed desire to return Child to C.T.'s care and the dearth of information concerning L.C. and her capacity to appropriately parent Child, L.C. is not a proper parental caregiver who is ready, willing, and able to provide appropriate care to Child. ***See In re B.B.***, 745 A.2d at 623 (where father was a virtual stranger to the children and had never cared for them, holding that the trial court properly declared the children dependent, and emphasizing that although father "says he is *willing* to provide proper parental care[,] … he has not shown he is *capable* of doing so. Rather, he decided to completely ignore his parental responsibilities altogether …." (emphasis in original)).[6]

Based upon the foregoing, we conclude that the trial court did not err or abuse its discretion in entering the Order adjudicating Child dependent.

Order affirmed.

---

[6] While L.C. may arguably have the ability to provide appropriate care, as recognized by the court's Order placing Child in her custody following compliance with the ICPC, she is a virtual stranger to Child and has not parented him since he was an infant. ***See In re B.B.***, 745 A.2d at 623 (adopting the trial court's finding that "father's choosing to be a stranger to his children, taking no responsibility for their care[,] and the fact his parental rights could possibly have been terminated demonstrate proper parental care is not immediately available from him.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/20/2018</u>